[Civ. No. 9603. First Appellate District, Division Two.—November 5, 1935.]

JOSEPH E. HARTING, Receiver, etc., Respondent, v. EDWARD CEBRIAN, Appellant.

Hartley F. Peart, Gus L. Baraty and Howard Hassard for Appellant.

F. J. Kilmartin and Knight, Boland & Riordan for Respondent.

STURTEVANT, J.—As receiver of Philip T. Chinn, the plaintiff sued to recover a judgment on a promissory note. The defendant appeared and filed an answer in which he denied the material allegations of the complaint and also pleaded an affirmative defense claiming that the note in suit was given in part payment for certain horses which the owner, Philip T. Chinn, misrepresented. The action was tried before the trial court sitting without a jury. The trial court made findings in favor of the plaintiff on all material issues. From the judgment entered on said findings the defendant has appealed.

The defendant attacks many of the findings. He claims that there was no consideration for the note in suit and that said document was delivered conditionally and that the condition precedent was never performed. The parties do not seem to be disagreed on the rules of law but present the controversy on questions of fact.

On the fourteenth day of February, 1927, Philip T. Chinn sold and delivered to Edward Cebrian and S. W. Richards two race horses. For one horse, Black Tony, the sales price was $2,500. For the other horse, The Freshman, the sales price was $8,000. The defendant, Edward Cebrian, drew his check for $5,250 and delivered it to the vendor. At the same time Edward Cebrian and S. W. Richards made and delivered their joint promissory note in the sum of $5,250 to the vendor. From time to time that note was renewed by the makers. Mr. Cebrian says it was renewed six or seven times. Except as noted below, when a renewal note was executed the older note was returned to Mr. Cebrian and was destroyed. At the time of the trial the plaintiff produced and offered in evidence as exhibit 2, a note, which is as follows:

"$5,617.50 November 27, 1929.

"Four months after date we promise to pay to the order of Phil T. Chinn, Five Thousand Six Hundred and Seventeen and 50/100 Dollars Payable at First National Bank & Trust Co., Lexington, Ky.

"Value received Six percent interest from Date.

"EDWARD CEBRIAN
"S. W. RICHARDS

"No. —— Due ——"

He also produced and offered in evidence as exhibit 1 another note, to wit, the note in suit, which is as follows:

"$5,954.55 November 27, 1930 19—

"Ninety days after date we promise to pay to the order of Phil T. Chinn Five Thousand Nine Hundred and Fifty-four and 55/100 Dollars with interest from date at the rate of six per cent per annum.

"Value received negotiable and payable at First National Bank & Trust Co., Lexington, Ky.

"EDWARD CEBRIAN

"No. —— Due ——"

Before proceeding it may be recited that Mr. Richards travels from one race course to another where he engages in developing and running race horses. Mr. Chinn resides at Lexington, Kentucky, but from time to time visits certain race courses. Mr. Cebrian resides in San Francisco and his occupation is much the same as Mr. Chinn's. All three men were more or less in touch with each other through correspondence, racing journals, and meetings at various tracks.

In November, 1930, Mr. Cebrian was staying at the Phoenix Hotel in Lexington, Kentucky. Speaking of that occasion Mr. Chinn testified: "I saw Mr. Cebrian and talked with him with reference to paying the note of November 27, 1929, which he and Mr. Richards had signed. He told me that he was unable to pay the note at that time and I told him that the bank was insisting that the note be paid or substantial payment made on the note. Mr. Cebrian told me that he could not do this at this time but he would renew the note and would try to take it up within the next three or four months. I left him after this conversation and then had the note prepared at my office and took it back to his hotel. Mr. Cebrian was not there and I left the note in an envelope for him and think he left Lexington that evening. However he returned the note to me within a day or two. My best recollection is that the note came back from Chicago, but I am not certain as to what point it was mailed from to me by Mr. Cebrian. . . . When I saw Mr. Cebrian in the Phoenix hotel and talked to him about the paying of the note and told him that the bank insisted that it be paid or a substantial payment made on it, Mr. Cebrian asked me as to whether I was going to get Mr. Richards to sign the note. I told him that I did not know

where Mr. Richards was but I would endeavor to get in touch with him and if I did would endeavor to have him sign the note. I told Cebrian that he also should try to locate Richards and have him sign the note. . . . Cebrian did not tell me that he was not going to pay the note and I would have to get after Richards, but he did say that he wanted me to get Richards to sign the note so that Richards would have to pay his one-half of it. I told him that I did not know where Richards was, if I could locate him I would endeavor to get him to sign it but told him I was looking to him as well as Richards for the payment of the whole note. I meant by that it was their joint note, both of them were liable to me for it and if I couldn't get it out of one I wanted the other one to pay it. . . . I have seen Mr. Richards since November, 1930. I told him that Mr. Cebrian had renewed the note and that Cebrian wanted him to sign it. Richards said he was perfectly willing to sign it but that he was broke and that it would not help the note or Mr. Cebrian any for him to sign it. That conversation was after the receiver was appointed. Richards promised he would take it up with the receiver as well as Cebrian. . . . My recollection is that at the time I went into the hands of a receiver the note was up at the bank as collateral on some paper that I had discounted at the bank. After the receiver had been appointed he brought the note to me and talked to me about collecting it from Mr. Cebrian. . . . The note of November 27, 1930, was a renewal note. . . . The original note had been renewed at regular intervals. I don't know the exact dates. They were prompt in renewing the note. . . . I knew that S. W. Richards and Edward Cebrian were purchasing the two horses together. . . . Mr. Cebrian gave me a check for around $5,000. At the same time a note was executed by Mr. Cebrian and Mr. Richards. . . . The note was given by Richards and Cebrian as a part payment of the purchase of the two horses from me, one of them was The Freshman and the other a horse whose name I don't recall. They were both bought by Cebrian and Richards together and the note was a joint obligation on their part for the unpaid purchase price of these horses. . . . I made every endeavor to get Mr. S. W. Richards to sign the note dated November 27, 1930. He did not refuse to sign it at any time, he promised to get in communication with Mr. Cebrian. My purpose in retaining the note dated

November 27, 1929, was to make it valid until we could get the note properly endorsed.''

To the deposition of Joseph E. Harting, the receiver, plaintiff's exhibit 1, set forth hereinabove, was attached and marked exhibit "A". The other note was attached and marked exhibit "B". At the time of giving his deposition both notes were shown to him and identified. Referring to them Mr. Harting testified as follows: "At the time I became receiver for Colonel Philip T. Chinn and Himyar Stud I took into my possession both of these notes. I held Exhibit 'B' because that man hadn't signed it, I was holding it for collateral until this man signed it and I was going to return the other note. In other words, I held the first note to keep the liability alive against Mr. Richards.''

In testifying regarding the circumstances under which he executed the note dated November 27, 1930, Mr. Cebrian stated the conversation held between him and Mr. Chinn was as follows: ''Well, Mr. Chinn said that the bank was pressing him for the notes; that they wanted him to cash up; and I told him, 'Well, I don't feel responsible for this note. You know, I signed the original as an accommodation to you, and I am not upon this note;' and he said, 'Well, will you renew it?' 'Well,' I said, 'I will do the same as I did before; you get Richards' signature to it, and I will sign it, too.' So he said, 'I will leave it for you, and have you—you will first sign it, and I will get Richards' signature.' . . . He sent the note up to me with the clerk, and I was busy at the time, so I just took it along with me. . . . When I got to Chicago I signed it and put it in an envelope and mailed it to Mr. Chinn. . . . Now with reference to the prior renewals of the $5,250 obligation there might have been six or eight. It was. at irregular intervals. They were signed by myself and the other maker, S. W. Richards. When they were signed Mr. Chinn would mail me the prior one after he got Mr. Richards' signature on the renewal. . . . They were signed by myself and Mr. Richards—all of them. Some of them Mr. Chinn would mail me and they would be sent to me to sign—I was out here in San Francisco, and I would mail it back to him and he would get Richards' signature on it and then mail me the canceled one. . . . Sometimes we met and sometimes he would mail me a note, a blank note, I mean it wasn't filled out or look like that one there, and I would sign it and re-

turn it to him and he would get Mr. Richards' signature to it and then he would return me the canceled note. He told me that he was using the Richards' note, for he needed it as security in the bank and it was an accommodation for me that I renewed it at the time." As stated above the defendant claims there was no consideration for the note sued on. The facts show that plaintiff's exhibit 1 was at least an implied contract to forbear for the period of ninety days. That fact alone constituted a sufficient consideration to support the instrument. (*Humboldt Sav. & Loan Soc.* v. *Dowd,* 137 Cal. 408, 412 [70 Pac. 274].)

 To the claim of the defendant that the note in suit was placed in the hands of Mr. Chinn on the condition that it would not take effect until it had been signed by S. W. Richards, the plaintiff asserts that the defendant was bound to prove an agreement to that effect. That is clearly a sound legal proposition. As to whether the agreement was proved or not proved in the instant case was a question of fact. If the trial court believed the testimony given by Mr. Chinn, and from its findings we must assume that it did, then it would follow that the agreement was not proved. That witness testified that he promised to attempt to get the signature of S. W. Richards and furthermore that he did make the attempt.

 The defendant complains because the trial court did not make findings sustaining his claim that Mr. Chinn made false representations of and concerning one of the horses, The Freshman. We think the point may not be sustained. The vendor highly praised that horse. He made strong statements as to what kind of a horse the animal was. At the time of the sale the horse was three years old. The testimony shows that the owner thought there were great possibilities in him. His statements were, and must have been received as expressions of his opinion. The record contains nothing showing that those opinions were not honestly entertained.

 Again it is claimed that the defendant was an accommodation party; but, under the facts we think it is clear that he was not shown to be such. (Civ. Code, sec. 3110.)

 The plaintiff offered in evidence, and over the objection and exception of the defendant the trial court admitted, what purports to be a copy of the order of the District Court of the United States for the Eastern District of Kentucky,

appointing Joseph E. Harting receiver of Himyar Stud and Philip T. Chinn. The objection was based on the claim that the document was not properly certified. (Code Civ. Proc., sec. 1923.) Counsel do not cite us to a decision of a court of review in this state construing that section. In nearly every jurisdiction there are similar statutes. No certain words are necessary to create a valid certificate attesting a purported copy as a ''certified copy''. (11 C. J. 78; *Sawyer* v. *Lorenzen & Weise,* 149 Iowa, 87 [127 N. W. 1091, Ann. Cas. 1912C, 940].) In the cited case the Supreme Court of Iowa said: ''We have then only to consider whether the paper filed with the auditor is within the meaning of the law a 'certified copy' of the resolution. It certainly purports to be a copy, and the only feature which can give rise to doubt as to its sufficiency is whether it is properly certified. The recorder is the official custodian of the town records, and as such his certificate to the correctness of the copy is all that is required. Code, sections 4630, 4635, 4643. To be sufficient it is not necessary that the word 'certificate' or 'certify' should be employed. To 'certify', as that term is ordinarily used with reference to documents or papers, is to affirm or to assert in writing the correctness or identity of the designated instrument.''

A similar point was made regarding the admission in evidence of an order of the District Court of the United States for the Eastern District of Kentucky authorizing and directing this plaintiff to commence this action. That order was signed by the judge and was dated February 24, 1931. It was followed by the words: ''Certified: S. W. Stacy Clerk by Spencer Finnell, D. C. (Seal of United States District Court, East. Dist. Ky., United States of America.)'' It is contended that said order was not certified to be a correct copy. On the authority of the Sawyer case, *supra,* we think the objection was not well founded. The order appointing the receiver contained broad language authorizing and directing the commencement of such actions. Under such circumstances no further order was necessary. (*Title Ins. & Trust Co.* v. *Grider,* 152 Cal. 746, 749 [94 Pac. 601].)

It follows that the judgment appealed from should be affirmed. It is so ordered.

Nourse, P. J., and Spence, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 2, 1936.